UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) 1:18-CR-169-TRM-CHS |
| | ) |
| LARRY G. MADDOX | ) |
| also known as "LITTLE LARRY" | ) |

**REPORT AND RECOMMENDATION**

**I. Introduction**

Defendant is charged with one count of bank robbery in violation of 18 U.S.C. § 2113(a). Defendant raises a "*Miranda*-in-the-middle" argument and moves to suppress statements he gave to police while in police custody, asserting he was interrogated in violation of his Fifth Amendment rights. [Doc. 20]. The District Court has referred this matter to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) for a Report and Recommendation. For the reasons stated herein, the Court recommends that the motion to suppress be **GRANTED**.

**II. Facts**

The Court held an evidentiary hearing on June 19, 2019, on Defendant's Motion to Suppress Statements. The government presented one witness, Matthew Hennessee of the Chattanooga Police Department (CPD). At all times relevant to this motion, Officer Hennessee was assigned to a special task force at the Federal Bureau of Investigation to investigate violent crimes in the Chattanooga area. The Court makes the following factual findings based upon Officer Hennessee's testimony and a recording of the police interview which produced Defendant's statements at issue in this case:

- On August 29, 2018, Officer Hennessee went to the scene of a bank robbery at the First Tennessee Bank on Brainerd Road in Chattanooga, Tennessee, shortly after its occurrence, to assist CPD officers in the investigation.

- A witness at the scene of the robbery was able to see the tag number on the get-away vehicle, a white Chevrolet pick-up truck. Using the tag number, officers identified the person to which the vehicle was registered, as well as that person's address.

- CPD officers drove to the address and asked the registrant if he knew where his truck was. He replied he had lent the truck to someone. At that moment, the white Chevrolet pickup truck drove by the house. The owner pointed at it and said, "there it goes." The CPD officers gave chase. The driver of the truck lost control on wet pavement, and the truck crashed.

- Police apprehended Larry Maddox, the Defendant, who was driving the truck, and transported him to the Chattanooga police station for questioning. Money from the bank robbery was found in the truck.

- Officer Hennessee went to the police station to interview Defendant. Defendant's interview was recorded on both audio and video, and a CD of this recording was introduced into evidence at the suppression hearing.

- The CD reflects that the interview began with Officer Hennessee talking with Defendant alone in the interview room for about eight minutes while awaiting the arrival of CPD Investigator Terry Barnes who was, at that time, interviewing the owner of the white Chevrolet pick-up truck.[1]

- Officer Hennessee first asked Defendant how he was doing. Defendant responded, "not so bad considering." Defendant and Officer Hennessee then discussed a number of topics: Defendant's losing control of his truck on the slick road and how slippery the road is immediately after a rain. Hennessee asked him whether he was still on probation and/or supervised release for purposes of state and federal custody and Defendant answered questions regarding that topic. They discussed how times changed on the outside while Defendant, who was previously incarcerated, was in prison; prison life; and Defendant's girlfriend. Hennessee asked about drugs in prison. Defendant acknowledged the presence of drugs in prison, but did not implicate himself in drug use.

- After about eight minutes of this discussion, CPD Investigator Barnes entered the room.[2] Defendant continued to talk about what prison was like for a couple of minutes before Barnes introduced himself, and Hennessee told Defendant that he (Hennessee) was working for the FBI. Hennessee, Barnes, and Defendant then engaged in the following conversation:[3]

    **Hennessee:** You know why we're kinda here? We want to talk to you.

    **Defendant:** . . . about the bank.

---

[1] The interview with Defendant begins at 4:18 on the CD introduced into evidence.
[2] Barnes enters the room at 4:26 on the CD.
[3] 4:29 on the CD.

>**Hennessee:** (Nodding) Yea.
>
>**Defendant:** There ain't much to talk about to be honest.
>
>**Hennessee:** No, it's pretty cut and dried.
>
>**Barnes:** It is what it is. I'm more curious about the reasons why. A lot of people don't ever ask that question, about why people do things. I'm more interested in that, kinda first.

Defendant gave a long-winded response to this statement. He told the officers that, if he had a job, he could make it. He discussed how much life had changed outside of prison during the time he was incarcerated. He said he had a job and talked a little bit about it. They discussed prison life. Defendant said that, when he was released from prison, things got bad with his girlfriend and his probation officer made him leave his house where they were living together because he was not allowed around his girlfriend. He said the house belonged to him. He started living at the Hamilton Inn which Barnes and Hennessee agreed was a terrible place. After about eight minutes of talking, Defendant said, "the why, the why, you know, pressure." The officers would interject from time to time with a question about his work, or girlfriend, or probation officer.

The conversation continued with a discussion of how "out of place" Defendant has felt since being released from prison—including the difficulty of relating to the younger generation, how confusing he found computers and smart phones, and about the difficulties he started to have at his job when a promised position in food prep did not happen and he had to miss some work to meet court-mandated supervisory requirements. The officers were polite, friendly, even empathetic. At 4:41 on the CD the following discussion occurred:

>**Defendant:** The why is (garbled) keeping my word solid and me keeping my word solid and the bank don't really intertwine other than my own personal actions. You understand what I'm saying? Other than that, the

two are so far apart. And uh, I hadn't been working in a while.

**Hennessee:** What happened with that?

Continuing his statement, Defendant said his hours at work were cut, he was eventually let go, he could not pay his bills, and "everything went downhill," especially when he couldn't live in his own house. The officers continued to interject occasionally, commenting on something Defendant said or asking about his work or living arrangements. At one point, Hennessee said, "that math ain't there." Defendant talked more about being laid off. Then Defendant said, "it ain't working; no, it ain't working, you know." The following colloquy then took place:[4]

**Barnes:** I've got a few questions.

**Defendant:** Shoot, shoot, shoot.

**Barnes:** Um, but, you, this is nothing new, you talking to us, obviously.

**Defendant:** Right, right, hand it to me, lay it on me.

**Barnes:** You know, this is still America and I still have to read you your rights. Let me get that out of the way so we can talk.

**Defendant:** You got profiles [sic] you got to take care of.

**Barnes:** You're right. Before you answer any questions, you must understand your rights.

Thirty-one minutes after Hennessee began talking with Defendant and twenty-three minutes after Barnes began talking with Defendant specifically about "the why," Barnes orally gave Defendant his *Miranda* warnings. Defendant wondered if the *Miranda* warnings had changed any since he had last heard them, and Barnes assured Defendant they had not. Barnes then asked if Defendant understood his *Miranda* warnings and Defendant said he did. Barnes subsequently read a *Miranda* waiver form to Defendant who also read it and signed it. The conversation then

---

[4] 4:49 on the CD.

continued immediately in the same interview room:

> **Barnes:** The question I have for you, and *we've already kinda been talking about it a little bit, at least you have, is I wanted to know why*, what occurred, and wanted to know the involvement of any others potentially in today's course of events, are you working alone today?
>
> **Defendant:** Yea.

After this statement—and in response to Defendant's rubbing his shoulder—Barnes asked if Defendant was hurt and needed to go to the hospital. Defendant declined. Defendant then stated that no one else was involved and that he had asked to borrow the truck. They talked some more about where Defendant had been living—in hotels and on people's couches. Barnes asked him about his reason for being at the Hamilton Inn. Defendant said he was living there. The conversation continued:[5]

> **Barnes:** You mentioned pressure caused you . . ..
>
> **Defendant:** . . . yea, you know, it's like, you know when you give your word to do something, and everything in you is like I'm going to keep my word no matter what, and it's really more or less the pressure of my own mind.

For the next approximately forty minutes, the conversation continued. The officers continued to be calm, polite, and friendly. Defendant told the officers he'd met a woman and promised to help her, but he'd run out of money. He said he had $25 in his account, and he wanted to help his sister. He talked more about the difficulty of adjusting to life outside of prison. At 5:09 on the CD, Defendant said, "Almost pretty much everything I've seen gonna answer the why; it just ain't gonna be direct." Later he said, "this is all part of the why."

Approximately 33 minutes after Barnes gave Defendant his *Miranda* warnings, Barnes began to ask more specific questions about the robbery itself. He asked Defendant what he intended

---

[5] 4:56 on the CD.

to do with the money, what he had said to the clerks and the security guard in the bank, whether he was armed, and where he went after the robbery.[6] The conversation got side-tracked for about nine minutes with conversation about an old car chase in which Defendant was involved in the 1980s until returning to the subject of the bank. Defendant said he didn't intend to harm anyone, and he talked more about the bank clerks (tellers) and the car chase that day. There was more conversation unrelated to the bank. Then, approximately two hours and twenty minutes after police brought Defendant to the interview room, Defendant began writing his statement about the bank robbery.[7] This written statement was submitted to the Court as a late-filed exhibit on September 27, 2019. [Doc. 27]. While it took Defendant about 65 minutes to write, the statement is more accurately described as a one page letter written to the bank tellers at First Tennessee Bank apologizing for upsetting them and asking for their forgiveness. Defendant does not explicitly admit in his written statement that he robbed the bank, but such an admission is implied in the apology. The entire interview with Defendant lasted about three hours and 45 minutes.

At the suppression hearing, Officer Hennessee testified that he likes to understand what has led people to where they are in their lives and that, in his pre-*Miranda*-warning discussion with Defendant, he was trying to establish a dialogue with Defendant to help him feel more comfortable. The Court does not dispute the authenticity of Officer Hennessee's stated intentions. They may well have been completely benign. However, as will be discussed in further detail below, the police officers' subjective intent is not a controlling factor in determining when the *Miranda* warning should have been administered to Defendant.

---

[6] 5:29-5:46 on the CD.
[7] 6:38 on the CD.

### III. Analysis

#### A. The Parties' Contentions

Defendant contends he was subjected to a *Miranda*-in-the-middle interrogation which requires suppression not only of his pre-*Miranda* statements but also the statements he made after Barnes gave him *Miranda* warnings.[8] A *Miranda*-in-the middle interrogation is a two-stage custodial interrogation, the first stage occurring without *Miranda* warnings and the second stage occurring after *Miranda* warnings. If the failure to give *Miranda* warnings in the first stage so taints the defendant's waiver of *Miranda* warnings in the second stage—such that the waiver was involuntary—then the statements made in the second stage of custodial interrogation are suppressed. *Missouri v. Seibert*, 542 U.S. 600 (2004). The government contends it did not engage in custodial interrogation until *after* Miranda warnings were given. As a matter of logic, there can be no *Miranda*-in-the-middle problem if *Miranda* warnings were not required in order for Defendant's pre-*Miranda* statements to be admissible at trial. *See United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013) ("In the absence of a custodial interrogation, the requirement to recite the *Miranda* warnings is not triggered and the analysis is at an end.") The Court's analysis begins with the Fifth Amendment and the definition of custodial interrogation.

#### B. *Miranda* Warnings and Custodial Interrogation

##### 1. *Miranda* Warnings Must Be Given Before Custodial Interrogation in Order to Use a Confession at Trial in the Government's Case-In-Chief.

The Fifth Amendment protects a person from being compelled to incriminate himself. U.S. Const. amend. V. A suspect who is in police custody and subject to interrogation must be given *Miranda* warnings against self-incrimination; if no *Miranda* warnings are given, then the

---

[8] It is the Court's understanding that the government does not intend to use any statements Defendant made prior to receiving *Miranda* warnings.

incriminating statements elicited cannot be admitted at trial. *Dickerson v. United States*, 530 U.S. 428 (2000); *Miranda v. Arizona*, 384 U.S. 436 (1966). The Fifth Amendment and the Due Process Clause of the Fourteenth Amendment also require that a statement or confession be voluntary to be admitted into evidence. *Missouri v. Seibert* , 542 U.S. 600, 608-09 (2004); *Dickerson*, 530 U.S. at 433. The government bears the burden to prove by a preponderance of the evidence that, prior to custodial interrogation, the defendant was given his *Miranda* rights, that he voluntarily and intelligently waived his *Miranda* rights, and that his confession or statements were made voluntarily. *Seibert*, 542 U.S. at 608 n. 1; *United States v. Ray*, 803 F.3d 244, 270 (6th Cir. 2015). A statement is voluntary if the defendant's will was not "overborne" by the circumstances surrounding the confession. *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

If an individual in custody and subject to police interrogation is not given *Miranda* warnings, the issue of voluntariness is never reached. If an individual in custody makes unwarned statements in response to interrogation, such statements must be suppressed.[9] *Dickerson,* 530 U.S. at 443-44 (holding *Miranda* warnings are constitutionally required before the government can admit into its case-in chief statements made during custodial interrogation); *Tolliver v. Sheets*, 594 F.3d 900, 917 (6th Cir. 2010) ("In 2000, the [*Dickerson*] Court reaffirmed the rule that the prosecution may not use statements obtained through custodial interrogation in the absence of the specific rendering of the *Miranda* warning."); *United States v. Pacheo-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008) ("Where the booking exception does not apply to statements made before

---

[9] There are some exceptions to this rule, but none apply in this case. For example, one is the booking exception. Police may ask for information needed for booking purposes without giving *Miranda* warnings. *See United States v. Pacheco–Lopez*, 531 F.3d 420, 423 (6th Cir.2008). Another exception is for public safety. *New York v. Quarles,* 467 U.S. 649, 655 (1984) ("We hold that on these facts there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved.")

administration and voluntary waiver of *Miranda* rights, those statements are irrebuttably presumed involuntary and must be suppressed.") ( citation omitted).

### 2. Custodial Interrogation is Express Questioning or Its Functional Equivalent

The government offers several arguments why it contends Hennessee and Barnes did not engage in custodial interrogation before Barnes gave Defendant *Miranda* warnings:

- The statements were not made in response to express questioning or in response to officer's statements "designed to elicit a response." It was not reasonably foreseeable that anything they said prior to the *Miranda* warnings would elicit an incriminating response from Defendant. Defendant's statements were voluntary and volunteered. [Doc. 24, Gov.'s br. at 4].

- The defendant's discussion with law enforcement of his prior criminal history and prior experiences with law enforcement custody was merely background or 'small talk' and not relevant to the criminal issue at hand. *Id*.

- The discussion of defendant's background and life-experience was not a "haranguing" of a subject or questions designed to elicit a response nor was it foreseeable that anything they said would elicit a response. "It was a casual, relaxed conversation on a topic unrelated to this case." *Id*.

Custodial interrogation is not limited to express questioning of a suspect or haranguing of a subject in front of a suspect. "'Interrogation' includes 'express questioning *or its functional equivalent*.'" *Tolliver v. Sheets*, 594 F.3d 900, 917 (6th Cir. 2010) (emphasis added) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). "The 'functional equivalent' of express questioning includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Tolliver*, 594 F.3d at 917 (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990)). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Muiz*, 496 U.S. at 601. Thus, custodial interrogation includes "words or actions that, given the officer's knowledge of any special

susceptibilities of the suspect, the officer knows or reasonably should know are likely to have the force of a question on the accused, and therefore be reasonably likely to elicit an incriminating response." *Id.* (internal citation omitted); *Innis*, 446 U.S. at 301 ("A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.")

On the other hand, statements which are volunteered, i.e., not made in response to custodial interrogation, will not be suppressed for lack of *Miranda* warnings. *Innis*, 446 U.S. at 302-03. *Rhode Island v. Innis* is instructive. In *Innis*, police arrested an armed robbery suspect who invoked his right to remain silent. *Id.* at 294. While transporting the suspect to the police station, one officer mentioned to the other two officers in the vehicle that there was a school near the site of the robbery and it may be wise to continue to look for the shotgun used in the robbery. *Id.* at 294-95. The suspect then interrupted the conversation to tell the officers to turn the car around and he would show them where the shotgun was located. *Id.* at 295. The officers returned to the scene and gave *Miranda* warnings again to the suspect who then led the officers to the shotgun. *Id.* The defendant moved to suppress his statements. The Supreme Court held the defendant had not been subjected to custodial interrogation, i.e., express questioning or its functional equivalent:

> The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Innis*, 446 U.S. at 303.

*United States v. Chalmers*, 554 F. App'x 440 (6th Cir. 2014), also provides an example of statements which were not made in response to custodial interrogation. In *Chalmers*, police were transporting a defendant arrested on gun and drug charges to the police station. The defendant heard the officers asking dispatch to run a query on the gun they had recovered from defendant's home and discussing that the gun was stolen. Neither officer had spoken to the suspect; however, the suspect asked if the gun was stolen. An officer said it was "stolen out of Mississippi." *Id*. "Then Chalmers 'just blurt[ed] out,' saying 'I didn't steal that gun. I paid $20 for that gun off the street. I didn't steal nothing." *Id*. The *Chalmers* court held these incriminating statements were not the result of express questioning or its functional equivalent; rather, the defendant himself had initiated the conversation and the officers' statements to each other were not designed to illicit a response. *Id.* at 448.[10]

### 3. The Officers Engaged in Custodial Interrogation before Giving *Miranda* Warnings

Applying the broad definition of custodial interrogation to the facts in this case, the Court finds Defendant was subjected to custodial interrogation without the benefit of *Miranda* warnings. Immediately after his arrest following the car chase, Defendant was transported to the police station and placed in an interview room—not the booking area or a holding cell. It would have been reasonably clear to anyone, including the Defendant, that he was in the room for an interview with police about the circumstances that led to his arrest. During the first eight minutes of the conversation, Hennessee asked Defendant specific questions. However, those questions—which

---

[10] It is important to distinguish between *voluntary* statements and *volunteered* statements; they are not the same. As previously discussed, a statement in response to custodial interrogation cannot be considered *voluntary* absent valid waiver of *Miranda* warnings. *Dickerson*, 530 U.S. at 443-44. A *volunteered* statement is a statement not made in response to custodial interrogation; it is sometimes referred to as a spontaneous statement and so *Miranda* warnings are not required for the statement to be used at trial. *See United States v. Chalmers*, 554 F. App'x 440, 447 (6th Cir. 2014) (referring to suspect's statements in *Innis*, which did not require *Miranda* warnings, as "spontaneous.")

did not refer to the bank robbery—were not designed to elicit incriminating information. Rather, they related to his probationary status, conditions in prison, and his adjustment to life outside of prison. Such questions did not require *Miranda* warnings. However, when Barnes entered the interview room, the purpose of the conversation changed—the officers wanted to know "the why" about the bank.

> **Hennessee:** You know why we're kinda here? We want to talk to you.
>
> **Defendant:** . . . about the bank.
>
> **Hennessee:** (Nodding) Yea.
>
> **Defendant:** There ain't much to talk about to be honest.
>
> **Hennessee:** No, it's pretty cut and dried.
>
> **Barnes:** It is what it is. I'm more curious about the reasons why. A lot of people don't ever ask that question, about why people do things. I'm more interested in that, kinda first.

There can be no doubt that Hennessee's and Barnes' statements were designed to elicit responses from Defendant as to why he robbed the bank. Hennessee confirmed with Defendant that they were there to talk about "the bank." In that context, Barnes' question concerning the "reasons why . . . about why people do things," would be interpreted by Defendant to mean "why did you rob the bank." Under these circumstances, it was foreseeable by Barnes and Hennessee that their statements would elicit from Defendant a response as to why he robbed the bank.

Neither Defendant's willingness to talk about why he robbed the bank, nor his prior familiarity with his right to *Miranda* warnings, excuses the lack of *Miranda* warnings. As previously discussed, the Supreme Court has held that *Miranda* warnings are constitutionally

mandated before a defendant's statements, made in response to custodial interrogation, can be used by the government in their case-in-chief. *Dickerson v. United States*, 530 U.S. 428 (2000).[11]

To the extent Defendant explains *why* he robbed the bank, he is necessarily confessing to robbing the bank. A person cannot explain why he did something without admitting that he did it. It is worth noting that the officers did not ask Defendant, during the second post-Miranda-warning stage of the interrogation, whether he had, in fact, robbed the bank. They did not need to pose this question—he had already admitted to it when he told them "the why." The Court concludes that the incriminating statements elicited from Defendant—before Miranda warnings were administered and after Barnes entered the interview room—are not admissible at trial.

### C. The *Seibert* Multi-Factor Test and Miranda-in-the-Middle Interrogation

#### 1. The *Seibert* Multi-Factor Test Applies in the Sixth Circuit

The more difficult question presented to the Court is whether Defendant's statements made after he received *Miranda* warnings should be suppressed. In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court addressed the effectiveness of mid-stream *Miranda* warnings given in a two-part interrogation.

In *Seibert*, a police officer, employing a deliberate interrogation strategy, did not give the defendant *Miranda* warnings before questioning the defendant about a death that occurred in her home when the home burned. *Id*. at 604-06. After thirty minutes of questioning, the defendant admitted she had someone set the fire while the victim was sleeping and had planned for the victim

---

[11] The *Dickerson* Court, 530 U.S. at 444, even while holding *Miranda* warnings are constitutionally mandated, anticipated that some seemingly voluntary statements will be excluded from evidence because of the failure to give *Miranda* warnings:
> The disadvantage of the *Miranda* rule is that statements which may be by no means involuntary, made by a defendant who is aware of his "rights," may nonetheless be excluded and a guilty defendant go free as a result. But experience suggests that the totality-of-the-circumstances test which § 3501 seeks to revive is more difficult than *Miranda* for law enforcement officers to conform to, and for courts to apply in a consistent manner.

to die. *Id*. The officer and the defendant then took a twenty minute break after which the officer *Mirandized* the defendant, and the defendant again confessed in response to the officer's questions. *Id*.

Five justices held the warned confession should be suppressed. *Seibert*, 542 U.S. at 610-623. Justice Souter in a plurality opinion joined by Justices Stevens, Ginsburg, and Breyer held that an objective, multi-factor test should be applied to determine whether to suppress statements given in a *Miranda*-in-the-middle-interrogation. *Id.* at 609-617. Justice Kennedy held that a subjective test should be applied to the admissibility of the second statement, a test which focused on the officer's intent in using the two-part interrogation technique. *Id.* at 618-22. For a time after *Seibert*, the Sixth Circuit Court of Appeals applied both the objective and subjective tests to Fifth Amendment challenges made to statements given during *Miranda*-in-the-middle-interrogations.[12] However, in *United States v. Ray,* 803 F.3d 244 (6th Cir. 2015), the Sixth Circuit Court of Appeals explicitly adopted the plurality's objective, multi-factor test to determine the admissibility of statements given after mid-stream *Miranda* warnings. *Id.* at 272 ("we adopt *Seibert's* plurality multi-factor test for this Circuit. . . .") So, the Court will apply only this objective, multi-factor test to this case.

"[T]he threshold issue when interrogators question first and warn later is . . . whether it would be reasonable to find that in these circumstances the warnings would function 'effectively' as *Miranda* requires*." Seibert*, 542 U.S. at 611-12. The *Seibert* plurality found such a scenario problematic: "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once police began to lead him over the same ground again." *Id.* at 613. The multi-

---

[12] *See e.g., United States v. McConer*, 530 F.3d 484, 497-98 (6th Cir. 2008); *United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009).

factor test provides an objective basis to examine "whether 'a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.'" *Ray*, 803 F.3d at 272-73 (brackets original) (quoting *Seibert*, 542 U.S. at 616). Those factors to consider are:

- First, the completeness and detail of the questions and answers in the first round of interrogation.

- Second, the overlapping content of the two statements.

- Third, the timing and setting of the first and the second interrogations.

- Fourth, the continuity of police personnel during the interrogations.

- Fifth, the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615; *Ray*, 803 F.3d at 272-73. The plurality did not include the officer's intent as a factor. The plurality explained, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from the intent that show the question-first tactic at work." *Seibert*, 542 U.S. at 616, n. 6.

   **2.**  **Application of the *Seibert* Multi-Factor Test Requires Suppression of Defendant's Post-Miranda Statements.**

Immediately after Barnes administered *Miranda* warnings to Defendant, he proceeded to lead Defendant down much of the same ground that they covered in the first stage of interrogation:

> The question I have for you, and *we've already kinda been talking about it a little bit, at least you have, is I wanted to know why,* what occurred, and wanted to know the involvement of any others potentially in today's course of events, are you working alone today?

After Defendant confirmed he was working alone and did not need medical attention, they

continued to talk about the various reasons why Defendant robbed the bank. They talked about Defendant's dire financial situation and the pressure of that situation. At one point, Defendant stated, "this is all part of the why."[13] This conversation referencing the various pressures that led to Defendant's robbing the bank continued for about 35 minutes until Barnes finally asked some direct questions about how Defendant conducted the robbery—questions which were not part of the first stage of interrogation.

Thus, as to the first factor in the *Seibert* multi-factor test, the Court finds that the completeness and detail of the questions and answers in the first stage of interrogation were less than those of the post-*Miranda*-warning second stage of interrogation. However, as to the second factor of the Seibert test, the Court finds significant overlap of content in the first and second stages of the interrogation. Defendant doesn't talk about *how* he robbed the bank in the pre-*Miranda*-warning interrogation (indeed, he was only asked "why"); however, such interrogation did yield an implicit admission that he robbed the bank. The second, post-*Miranda* interrogation by law enforcement was simply a continuation of questioning as to why Defendant robbed the bank—albeit in more detail.

The third, fourth, and fifth factors also lean strongly toward suppression. There is no temporal gap between the two stages of interrogation other than the time it took Barnes to give Defendant his *Miranda* warnings. There is also no change in the setting of the two stages of interrogation. Both were conducted in the same interview room. Further, there is complete continuity of police personnel during both stages, and the officers treated the second round as continuous with the first.

---

[13] 5:25 on the CD.

The Sixth Circuit's decision in *United States v. Pacheo-Lopez*, 531 F.3d 420 (6th Cir. 2008)—a case in which appellate court suppressed a post-*Miranda* statement following mid-stream *Miranda* warnings—is instructive. In *Pacheo-Lopez*, police arrived at a suspected drug house to execute a search warrant where they found defendant Lopez and a white pick-up truck parked in the driveway. During the search, Lopez was handcuffed and, pursuant to police questioning, he stated he had driven the white truck from Mexico, and he offered police the keys. At that point, police gave Lopez his *Miranda* rights and immediately asked him if he had brought cocaine with him from Mexico. Lopez admitted he had transported cocaine. A subsequent search of the white truck revealed a hollowed out shaft in the drive train to accommodate cocaine. Relying on the Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600 (2004), the Sixth Circuit found all statements made by Lopez should be suppressed because the *Miranda* warning given after the defendant made unwarned statements in response to police interrogation were insufficient and ineffective to give Lopez an informed and voluntary choice to waive his *Miranda* rights as to the second statements. *Id.* at 425-29. The *Pacheo-Lopez* court found the third (continuity of time and place), fourth (continuity of personnel), and fifth factors (degree to which rounds were treated as continuous with each other) were particularly determinative in the case before it. The same officers conducted both phases of the interrogation in the same location with the only break being the time it took to read the *Miranda* warnings. *Pacheo-Lopez*, 531 F.3d at 427. The court also found the first factor (completeness and detail of the first round of questioning and statements) and second factor (overlapping content of the two statements) supportive of suppression because "the post-*Miranda* question resulted from the knowledge gleaned during the initial questioning—that Lopez had driven from Mexico to Kentucky . . . via pick-up truck, during the preceding week." *Id.* at 428.

The facts in the instant case present a stronger basis for suppression than the facts presented to the Sixth Circuit in *Pacheo-Lopez*. In the case under consideration, the degree of overlap in Defendant's pre-*Miranda* and post-*Miranda* statements is greater than that in *Pacheo-Lopez*. When law enforcement asked Defendant about the "why," they were asking him why he robbed the bank. Any possible confusion about the "why" was resolved when Defendant referred to "the bank" and law enforcement continued to pursue pre-*Miranda* questioning of Defendant about "the why." After discussing with Defendant what motivated him to rob the bank, they then administered the *Miranda* warnings and explored that topic in more detail.

The Court finds that four out of five of the factors in the *Seibert* multi-factor test clearly demonstrate that *Miranda* warnings in this case were ineffective. Consequently, Defendant's post-*Miranda* statements, both verbal and written, should be suppressed.

## IV. Conclusion

For the reasons stated herein, it is **RECOMMENDED** that Defendant's motion to suppress be **GRANTED**.[14]

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[14] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified constitutes a waiver of the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).